UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID W. POTTER,                           Case No. 1:15-cv-652
         Plaintiff,                          Dlottt, J.
                                                  Bowman, M.J.

    v.

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.

**REPORT AND RECOMMENDATION**

Plaintiff David Potter filed this Social Security appeal in order to challenge the Defendant's determination that he was not disabled between November 1, 2011 and December 31, 2012. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents a single claim of error for this Court's review. As explained below, I conclude that the ALJ's finding of non-disability should be AFFIRMED.

     **I. Summary of Administrative Record**

On January 23, 2012, Plaintiff filed an application for Disability Insurance Benefits ("DIB"). Plaintiff was insured for purposes of DIB only through December 31, 2012, and therefore must establish the onset of disability prior to that date to qualify for benefits. In his application, Plaintiff alleges a disability due to a multitude of physical ailments, including pain in his knees, arm/shoulder pain, carpal tunnel syndrome, and hernia(s). (Tr. 84).

After Plaintiff's applications were denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). On April 29,

1

2014, a hearing was held before ALJ Larry A. Temin. (Tr. 38-82). Plaintiff appeared in Cincinnati, Ohio along with counsel and an impartial vocational expert ("VE"). On June 23, 2014, ALJ Temin issued a decision, concluding that Plaintiff was not disabled. (Tr. 19-32). The Appeals Council denied further review; therefore, ALJ Temin's decision remains as the final decision of the Commissioner.

Plaintiff has a high school education and for many years was the sole employee of his own landscaping business. Plaintiff lives in a house with his wife, who works outside the home, his parents, and his two minor children. At the time of his date last insured ("DLI"), Plaintiff was 46 years old, which is defined as a younger individual (age 18-49). He reported that his employment ceased in October 2011 due to the seasonal nature of his business and a lack of work, as opposed to any physical limitations. However, there is no dispute that, as of November 1, 2011, Plaintiff could no longer perform his prior work.

For the 14-month period at issue in this appeal, the ALJ determined that Plaintiff had the following severe impairments: "osteoarthritis of the bilateral knees, status-post remote surgery; bilateral carp[a]l tunnel syndrome, status post surgery; status-post hernia repair surgeries; and obesity." (Tr. 21). The ALJ determined that Plaintiff did not meet or equal any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1, such that Plaintiff was entitled to a presumption of disability. (Tr. 23). Instead, the ALJ found that Plaintiff retained residual functional capacity ("RFC") to perform a range of sedentary work with the following restrictions:

> [T]he claimant could lift, carry, push, and pull up to 10 pounds occasionally and 5 pounds frequently. He could stand and/or walk for 2 hours during an eight-hour workday (for up to 30 minutes each hour). He could sit for 5 hours during an eight-hour workday. He could never crawl, climb ladders, ropes, and scaffolds, or work at unprotected heights or around hazardous machinery. He could only occasionally stoop, kneel, crouch, or climb

2

> ramps and stairs. He could only occasionally reach above shoulder level with his bilateral upper extremities, and could only frequently perform feeling and fingering activities with the bilateral upper extremities.

(Tr. 24). Based on the testimony of the vocational expert, ALJ Temin determined that although Plaintiff still could perform jobs that exist in significant numbers in the national economy, including the representative occupations of credit authorization clerk, security monitor, and document preparer. (Tr. 32).

In his Statement of Errors, Plaintiff argues solely that the ALJ erred by improperly evaluating the medical evidence - specifically, by failing to give controlling weight to the opinions of two treating physicians.

**II. Analysis**

**A. Judicial Standard of Review**

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence

3

supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion.... The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his or her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. § 404.1512(a). A claimant seeking benefits must present sufficient evidence to show that, during the relevant time period, he suffered an impairment, or combination of impairments, expected to last at least twelve months, that left him unable to perform any job. 42 U.S.C. § 423(d)(1)(A).

**B. Weight Given to Plaintiff's Treating Physicians**

Plaintiff claims that the ALJ committed reversible error when he failed to give controlling weight to the opinions of Dr. Frank Noyes and Dr. Arnold Drummond. Both physicians completed medical source statements that offered RFC opinions, though their opinions were dated well after Plaintiff's DLI, in September and October 2013.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004); SSR 96-2p. The Commissioner is required to provide "good reasons" if the Commissioner does not give controlling weight to the opinion of a treating physician. *Id.*

ALJ Temin analyzed the treating physicians' opinions as follows, explaining his decision to give the September and October 2013 medical source statements only "some weight."

> Because these assessments are not well-supported by medically-acceptable clinical and diagnostic laboratory techniques and are not consistent with other substantial evidence in the case record, they cannot be given controlling weight, and are only given some weight. They are not well-supported by the diagnostic studies and clinical examinations discussed above. Their assessments are not consistent with the consultative examination by Dr. Swedberg and his opinions of the claimant's functional limitations….They are not consistent with the opinion of the medical expert, Dr. Brahms, an orthopedist, who was able to review all the evidence through the date of the expiration of the claimant's insured status…. They are also inconsistent with claimant's reports of the claimant's daily activities.

5

(Tr. 28).  The ALJ expressly listed the factors to be considered when a treating physician's medical opinion is not given controlling weight, and applied those factors to each of the treating physician's opinions.

First, as to Dr. Noyes, the ALJ acknoweldged that he began seeing Plaintiff in January 2010 and was Plaintiff's treating orthopedist.  Despite these two positive factors in favor of giving weight to Dr. Noyes's opinions, other factors clearly disfavored giving "controlling weight" to the extreme functional limitations found by Dr. Noyes:

> [T]he extreme limitations he proposes contrast with the conservative treatment he continued to provide the claimant during his timeframe.  Dr[.] Noyes cites to no objective support for his limitations.  His findings that the claimant's experience of pain and stress would "constantly" prevent him from attending to and concentrating upon even simple work tasks and his statement that the claimant would be absent from work an average of 5 days or more each month are not consistent with the objective evidence or the claimant's description of his activities.  Were the claimant's discomfort to persist at such levels during his insured period, it seems likely that the record would reflect more aggressive treatment, including surgery.  Dr. Noyes's suggested limitations conflict with the claimant's self-reported activities of daily living during the timeframe under review, which include his ongoing ability to mow his lawn, engage in household repairs, shop, drive, and attend his children's sporting events.  It bears further note that Dr. Noyes did not submit his opinion until October 2013, ten months after the claimant's date last insured.  Although[] he indicates that the limitations began on the claimant's alleged onset date (November 1, 2011), the record prior to December 30, 2012 does not support the limitations given.  Dr. Noyes saw the claimant for a total of eight or nine visits from January 2010 to September 2013, most of them before the December 30, [2012] expiration of the claimant's insured status….  The only office visit that says that the claimant is "completely disabled" is his last office note, on September 26, 2013, well after the claimant's insured status expired….  The undersigned concurs with Dr. Noyes that the claimant has experienced significant functional restrictions since his alleged onset date.  The residual functional capacity adopted herein fully accounts for his limitation to sedentary levels of work activity, as well as postural and environmental restrictions that adequately address the extent of his combined impairments.

(Tr. 28-29).

Plaintiff argues that the ALJ's analysis is flawed because Dr. Noyes's records at the time he began his treating relationship in January 2010 showed that Plaintiff suffered from "severe compartmental osteoarthritis in the medial compartment and significant lateral and patellofemoral osteoarthritis" and was already experiencing swelling and pain in his right knee. (Tr. 404, 406). At the time, Plaintiff had significant limitations in walking, which varied depending on the amount of swelling in his right knee, as well as postural limitations in kneeling and squatting. (Tr. 404-405). X-rays taken in 2010 showed moderate to severe degenerative joint disease of the medial compartment of the right knee, and moderate lateral compartment arthrosis with osteophyte formation and mild patellofemoral arthrosis and some osteophyte formation. (Tr. 405-406). An MRI from July 2010 also supported right knee limitations. (Tr. 408).

Plaintiff's 2010 imaging studies and Dr. Noyes's initial clinical examination records do not support his assertion of reversible error. The January 2010 records date long before Plaintiff's alleged onset of disability, at a time when Plaintiff does not dispute that he continued to be able to work full-time in his landscaping business. The fact that Plaintiff had significant arthritis and/or severe limitations in his right knee as early as 2010 - when he could still work fulltime in his landscaping business - does not mean that he was disabled from less demanding sedentary work nearly two years later. Even Dr. Noyes does not claim that Plaintiff's disabling limitations began until November 2011.

Records during and close in time to Plaintiff's alleged period of disability also fail to support Dr. Noyes's opinions. For example, in an office note dated September 8, 2011, Dr. Noyes explains that Plaintiff's symptoms are being treated "conservatively" with injections in an effort to put off as long as possible the need for a total knee

7

replacement. (Tr. 289). At his September 2011 visit, Plaintiff had only "mild tenderness" in his knee, which was described as "stable." (*Id.*). At a follow-up visit on December 13, 2011, Dr. Noyes refers to Plaintiff's work as a landscaper, and that Plaintiff received "significant relief" of right knee pain after his last steroid injection. Dr. Noyes's records do reference the likelihood of knee replacement at some undetermined future time "long term," but leave to Plaintiff to find "the right time to do this," conditioned on "significant symptoms and x-ray changes" supporting surgery at that unspecified future time. (Tr. 287; *see also* Tr. 26, noting that knee replacement was "no more than a 'long-term' option"). Along with periodic injections, Dr. Noyes primarily prescribed naproxen and advised Plaintiff to continue losing weight to reduce his symptoms.

On February 14, 2012, Plaintiff again returned for follow-up, at which time Dr. Noyes noted only "mild tenderness," and "mild swelling…with a mild inflammation of the Baker's cyst" in the right knee. (Tr. 285). Dr. Noyes added a note based upon Plaintiff's <u>new</u> report of chronic pain in his left knee "for approximately five years" that Plaintiff also had "early degenerative osteoarthritis" that was only "mildly symptomatic" in his left knee. (*Id.*). Plaintiff did not again return to Dr. Noyes for treatment of his knee pain prior to the expiration of his insured status. In the meantime, the left knee did not appear to worsen since a June 2012 examination showed no issues with range of motion and an August 2013 MRI showed only minor degenerative changes. (Tr. 26).

As the ALJ pointed out, Dr. Noyes's RFC opinions are dated October 3, 2013, long after Plaintiff's DLI. The RFC assessment states no diagnosis, and also leaves blank the frequency and length of contact questions. The last clinical note prior to the RFC form is dated 9/26/13, and reports Plaintiff's TENS unit "*is providing a significant decrease in pain*," despite simultaneously concluding that Plaintiff "is completely

8

disabled for Social Security." (Tr. 393, emphasis added). The only symptoms listed by Dr. Noyes to support his opinions are "pain/catching" in Plaintiff's "right knee." Despite the sole limitation being right knee pain that was significantly decreased with use of a TENS unit, Dr. Noyes opined that Plaintiff has extreme limitations in lifting (only occasionally up to 5 pounds, and never 10 pounds or more), as well as a multitude of other work-preclusive limitations. Dr. Noyes states that Plaintiff can sit for "about 7 hours," and can stand/walk less than 1 hour in a day, (Tr. 390), with a need to take unscheduled breaks "constantly." He states that Plaintiff must keep his leg elevated above his heart 100% of an 8-hour workday, and needs to lie down 30 minutes at a time before sitting up, standing, or walking around, but leaves blank a question asking the total amount of time per day that Plaintiff needs to lie down. (Tr. 290-291). He opines that Plaintiff's pain level and "stress" are so severe that they "constantly" interfere with the attention and concentration required to complete even "simple" work tasks, even though he states that Plaintiff has no psychological conditions that impact his functional limitations.[1] Dr. Noyes states that Plaintiff's physical and/or mental limitations in combination would result in Plaintiff being unable to perform work and/or away from the work environment more than 30% of the workday, and that Plaintiff would be absent from work 5 days or more each month. When asked for the basis of his opinions, Dr. Noyes checked generic boxes listing "history & medical file," "physical exams" and "x-rays, CT Scans or MRIs" without specifically identifying any record. For the reasons stated, neither the 2010 imaging studies nor Dr. Noyes's physical examination records provide any support for his opinions.

---

[1] In Plaintiff's own disability report, Plaintiff stated that he has "no problems" in paying attention, and has "no problems" in following written or spoken instructions. (Tr. 197).

9

In his reply memorandum, Plaintiff reiterates his reliance on the 2010 imaging studies as support for Dr. Noyes's RFC opinions. Those studies – revealing mild to moderate degenerative changes in the right knee at a time when Plaintiff was functionally able to work full-time – do not support Dr. Noyes's 2013 RFC opinions. Likewise, Dr. Noyes's own clinical records near in time and during the claimed disability period do not support extreme limitations.

The ALJ also noted inconsistent objective evidence and that Plaintiff's own reports contradicted Dr. Noyes's opinions. In one such example, Plaintiff describes the discrepancy between the amount of weight Plaintiff testified he could lift (30 pounds) and the amount that Dr. Noyes opined he could lift (5 pounds) as a "minor" difference attributable to the fact that Plaintiff is "a proud man" who likely overstated his own abilities. (Doc. 13 at 3, PageID 670). The undersigned cannot agree. Instead, the undersigned finds that the ALJ's analysis, including his rejection of the extreme limitations espoused by Dr. Noyes as not well-supported and contrary to other substantial evidence of record,[2] satisfies the "good reasons" standard and should be affirmed.

The ALJ's analysis of Dr. Drummond's opinions is similarly well-supported. Dr. Drummond, who is an internist and not an orthopedist, did not begin a treating relationship with Plaintiff until <u>following</u> the expiration of his insured status, in January 2013.

---

[2] Ample additional evidence contradicts the limitations endorsed by Plaintiff's treating physicians. For example, an office note dated December 14, 2011 reflects Plaintiff's then-recent report that he first noticed a bulge and discomfort in his left groin (hernia) while "underneath a car lubing joints." (Tr. 278). In a record following his DLI, he told Dr. Drummond that he injured his shoulder while doing yard work. (Tr. 27).

> "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Soc. Sec. Admin.*, 88 Fed.Appx. 841, 845 (6th Cir.2004) (citation omitted). To be relevant to the disability decision, "[p]ost-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 Fed.Appx. 478, 480 (6th Cir.2003) (citing *King v. Sec'y of Health & Human Servs.*, 896 F.2d 204, 205–06 (6th Cir.1990)).

*Kingery v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 598, 602 (S.D. Ohio 2015).

While conceding that Dr. Drummond first examined him after his DLI, Plaintiff protests that the evidence should be deemed to relate back prior to his DLI because the date of Dr. Drummond's first examination was a mere 7 days after his insured status expired. Dr. Drummond did not complete an RFC form until September 2013. Still, to the extent that Dr. Drummond affirms a statement that his patient's limitations have existed "since first visit," (Tr. 529) and that the same symptoms and limitations have lasted since 11/1/2011, (Tr. 526), he clearly intends for his opinions to relate back to the period during which Plaintiff was insured.

Unlike Dr. Noyes who relied solely on right knee pain for his opinions, Dr. Drummond lists diagnoses of "neck pain, back pain, arthritis," and carpal tunnel syndrome as supporting his opinions. (Tr. 526). He states that Plaintiff's primary symptoms are neck pain, headache, left arm numbness, joint pain including knee and shoulder, and hand numbness. (*Id.*) He opines that Plaintiff cannot carry any weight, even less than 5 pounds, that Plaintiff must lie down or recline at least 3 hours at a time before needing to sit up, stand up or walk about, and that Plaintiff needs to lie down and/or recline "all" day. (Tr. 527). Somewhat contradictorily, he also states that Plaintiff needs to lie down and/or recline "about 4 hours" during an 8-hour work day. (*Id.*) Dr. Drummond opines that Plaintiff can sit less than 1 hour in a day, is also limited to standing or walking less than 1 hour, with a need for unscheduled breaks throughout

11

the day every 20 minutes, for approximately 15 minutes at a time. In contrast to Dr. Noyes, Dr. Drummond states that Plaintiff does not need to elevate either of his legs at all. (Tr. 528). He opines that Plaintiff has zero ability to grasp, turn or twist objects, has no ability to manipulate his fingers, and has no ability to do any reaching with his arms, including overhead. Also unlike Dr. Noyes, Dr. Drummond opines that Plaintiff has anxiety that affects and/or contributes to the severity of his physical symptoms. Dr. Drummond agrees with Dr. Noyes that Plaintiff would miss 5 days or more per month from work and would be off task or away from work more than 30% of the time. (Tr. 529). Similar to Dr. Noyes, Dr. Drummond fails to explain the source of his opinions, other than checking boxes that he relied upon Plaintiff's "History & Medical File," "Progress and office notes," and "X-rays, CT Scans or MRIs." He also adds a note under "other" that his opinions are based upon "discussion with patient." (Tr. 529).

The ALJ analyzed Dr. Drummond's opinions as follows, giving them "little weight":

> [H]e had no treating relationship with the claimant, and did not examine him, before the expiration of the claimant's insured status. He thus has no basis to opine as to the claimant's limitations during such period except based on the claimant's self-report and a review of the claimant's records. He states that his opinion is based on discussions with the claimant and medical records, but does not indicate that he reviewed any records other than his own…. He is an internist and not a specialist in orthopedics. Moreover, his "fair" prognosis …conflicts with the work-prohibitive restrictions he provides, including the claimant's inability to stand, sit, and walk for more than a combined 2 hours each day. The restrictions he gives, including his opinion that the claimant would be unable to attend to or concentrate upon even simple tasks and would miss at least five workdays per month, are not well-supported and are not consistent with the objective evidence during the period before the claimant's insured status expired, and are not supported by the evidence of record as of December 30, 2012. … The claimant's statement to another source in December 2013 that he was unable to entertain any surgical opinion on left knee "due to his work" serves to further undermine both the grim findings offered by Dr. Drummond and the overall credibility of the claimant's symptomatic reporting….

12

(Tr. 29).

The ALJ's analysis adequately articulates "good reasons" for rejecting Dr. Drummond's extreme and unsupported opinions concerning Plaintiff's functional limitations. *Accord Price v. Com'r of Soc. Sec.*, 342 Fed. Appx. 172, 176 (6th Cir. 2009)(affirming rejection of treating physician who failed to identify objective medical findings to support his opinion); *Durio v. Com'r of Soc. Sec.,* 82 F.3d 417 at *2 (6th Cir. 1996) (treating source report not entitled to deference where it "appears to be a characterization of the plaintiff's complaints, rather than the results of any independent medical evaluation").

In determining Plaintiff's RFC after rejecting the RFC opinions of the two treating physicians, the ALJ gave the most "significant" weight to the opinions of an examining consultant, Dr. Phillip Swedberg, who examined Plaintiff on a date that fell squarely within Plaintiff's claimed disability period (June 5, 2012), in connection with Plaintiff's application for worker's compensation benefits. Dr. Swedberg conducted manual muscle testing and found full strength and completely normal results for Plaintiff's shoulder, elbow, fingers, hips, feet, with normal abilities to grasp, manipulate, and pinch, and normal abilities to pick up a coin, key, write, hold a cup, open a jar, etc. Plaintiff had no muscle spasm anywhere on his body, and there was no evidence of muscle atrophy in his legs. (Tr. 296). Although Plaintiff had some limitations in the range of motion of his spine and shoulders, he had no similar limitations in his elbows, wrists, hips, knees, ankles, hands, or fingers. Dr. Swedberg concluded that Plaintiff was capable of "performing a mild to moderate amount of sitting, ambulating, standing, bending, pushing, pulling, lifting and carrying heavy objects," but should avoid "prolonged kneeling." Dr. Swedberg further opined that Plaintiff "may have some

13

difficulty reaching overhead, but has no difficulty grasping and handling objects." (Tr. 302).

The ALJ pointed out that the treating physicians' RFC assessments also conflicted with the March 2014 opinions of independent medical expert Dr. Malcolm Brahms, a consultant who reviewed the entirety of Plaintiff's records addressing the claimant's severe impairments during his insured period. However, the ALJ assessed Plaintiff's RFC at a level that – while partially consistent with Dr. Brahms's opinions – reflected a greater level of impairment overall. (Tr. 29-30). In addition to citing objective medical records and other evidence to support the sedentary RFC he determined, the ALJ relied in part on the opinions of non-examining agency consultants, Drs. Esberdado Villanueva and Diane Manos. (Tr. 30). While partially consistent with the consulting opinions, the RFC found by the ALJ was more restrictive than that determined by Drs. Villanueva, Manos, or Brahms.

Plaintiff briefly argues that Dr. Swedberg's evaluation of Plaintiff's wrists and hands must be weighted "in light of the 2013 EMG which revealed severe bilateral carpal tunnel syndrome and Dr. Peter Stern's report." (Doc. 9 at 9, PageID 634). That report, which recommends surgery for Plaintiff's carpal tunnel syndrome, is dated approximately two months after Plaintiff's DLI. (Tr. 361). In fact, surgery was later performed. (Tr. 363). The ALJ adequately explained his reasons for finding Plaintiff's carpal tunnel syndrome to be severe but not disabling during the relevant period, and the limitations as stated are supported by substantial evidence. (Tr. 25-26). Dr. Stern's February 2013 report is not sufficient to prove more restrictive limitations existed prior to Plaintiff's DLI.

Because this case largely rests on Plaintiff's allegations of disabling pain, it is worth pointing out that Plaintiff does not challenge the ALJ's adverse credibility findings. The ALJ determined that Plaintiff's "statement concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible…." (Tr. 24). The ALJ cited multiple reasons for his finding, including Plaintiff's self-reported ability to lift 30 pounds during the timeframe he alleged to be disabled, as well as the lack of any difficulty in providing for personal care and grooming, his ability to cook full meals and drive his children to school on a daily basis, helping to care for a family dog, ability to mow his lawn and engage in household repairs, shop, visit restaurants, and attend his kids' sporting events. (Tr. 27; *see also* Tr. 193-197).

Although Plaintiff claimed severe restrictions based upon his knees, he did not seek treatment for his knee pain from Dr. Noyes or anyone else after February 2012, except for evaluations for his worker's compensation claim in June and August 2012. (Tr. 27). Those examination reports also fail to support Plaintiff's disability claim.

> All testing of his left knee remained within normal limits, with no signs of weakness, atrophy, effusion, or instability affecting either joint.… The claimant's subsequent evaluation…noted "moderate" anterior instability and "some" diminished sensation in his right knee, along with a "slight" reduction in his range of motion, difficulty in heel-toe walking, and "mild" crepitus with active movement…. The examining physician similarly concluded that the claimant retained normal reflexes and exhibited no signs of atrophy while expressly questioning both the claimant's effort during testing and pain behaviors deemed excessive in light of his medical condition…. Such observations raise questions concerning the severity of his symptoms, as does his statement…in December 2013 that he was unable to entertain any surgical option on his left knee "due to his work."

(Tr. 27, citing Tr. 309).

The ALJ also remarked:

> [Plaintiff's] unimpressive longitudinal work history lends little credence of his allegations of disability. Earnings and employment records indicate his minimal work during the fifteen years preceding his alleged onset of

15

> disability, with reported earnings throughout the entire period that exceed substantial gainful activity levels on only a handful of occasions…. The claimant's absence of constituent full-time work activity leading up to his alleged onset date leaves the timing of his purported disability without adequate foundation and does not permit an inference that he would be working in the absence of debilitating impairments.

(Tr. 27).

In sum, I find no reversible error in the ALJ's evaluation of the medical evidence or in his assessment of Plaintiff's residual functional capacity in this case.

### III. Conclusion and Recommendation

For the reasons explained herein, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** as supported by substantial evidence, and that this case be **CLOSED.**

 */s Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

DAVID W. POTTER,  Case No. 1:15-cv-652
         Plaintiff,  Dlottt, J.
                                              Bowman, M.J.

   v.

COMMISSIONER OF SOCIAL SECURITY,

         Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).